JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

WILLIE STOKES

**DEFENDANTS**

CITY OF PHILADELPHIA; ESTATE OF ERNEST GILBERT; ESTATE OF LAWRENCE GERRARD; ROBERT MARANO, ESQ. AND JOHN DIDONATO, ESQ.

**(b)** County of Residence of First Listed Plaintiff     PHILADELPHIA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant     PHILADELPHIA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

JOSHUA VAN NAARDEN, ESQ., VSCP LAW, 2001 MARKET ST, STE 3700, PHILA., PA 19103; 215-960-0000

Attorneys *(If Known)*

---

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [X] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [X] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

---

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury - Product Liability | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | | | 820 Copyrights | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | 368 Asbestos Personal Injury Product Liability | | 830 Patent | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | | | 835 Patent - Abbreviated New Drug Application | 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle | 370 Other Fraud | 710 Fair Labor Standards Act | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit (15 USC 1681 or 1692) |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 720 Labor/Management Relations | | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 360 Other Personal Injury | 380 Other Personal Property Damage | 740 Railway Labor Act | **SOCIAL SECURITY** | 490 Cable/Sat TV |
| 195 Contract Product Liability | 362 Personal Injury - Medical Malpractice | 385 Property Damage Product Liability | 751 Family and Medical Leave Act | 861 HIA (1395ff) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | | | 790 Other Labor Litigation | 862 Black Lung (923) | 890 Other Statutory Actions |
| | | | 791 Employee Retirement Income Security Act | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | 864 SSID Title XVI | 893 Environmental Matters |
| 210 Land Condemnation | [X] 440 Other Civil Rights | **Habeas Corpus:** | | 865 RSI (405(g)) | 895 Freedom of Information Act |
| 220 Foreclosure | 441 Voting | 463 Alien Detainee | | | 896 Arbitration |
| 230 Rent Lease & Ejectment | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment | 535 Death Penalty | | 871 IRS—Third Party 26 USC 7609 | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other | **Other:** | | | |
| | 448 Education | 540 Mandamus & Other | **IMMIGRATION** | | |
| | | 550 Civil Rights | 462 Naturalization Application | | |
| | | 555 Prison Condition | 465 Other Immigration Actions | | |
| | | 560 Civil Detainee - Conditions of Confinement | | | |

---

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [X] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

---

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1331 AND 28 USC 1343

Brief description of cause:

---

**VII. REQUESTED IN COMPLAINT:**

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  [X] Yes  [ ] No

---

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*

JUDGE _____   DOCKET NUMBER _____

---

DATE
January 27, 2022

SIGNATURE OF ATTORNEY OF RECORD
*Joshua Van Naarden*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: __c/o VSCP Law, 2001 Market Street, Suite 3700, Philadelphia, PA 19103__

Address of Defendant: __1515 Arch Street, 17th Floor, Philadelphia, PA 19102__

Place of Accident, Incident or Transaction: ____Philadelphia County____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1.  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☒

4.  Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __1/27/22__   *Joshua Van Naarden*   __86740__
Must sign here
*Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**   *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☒ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify): _____*

**B.**   *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify): _____*
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify): _____*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Joshua Van Naarden__, counsel of record *or* pro se plaintiff, do hereby certify:

- ☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: __1/27/22__   *Joshua Van Naarden*   __86740__
Sign here if applicable
*Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | |
|---|---|
| WILLIE STOKES | : |
| | : |
| v. | :     NO. 22- |
| | : |
| CITY OF PHILADELPHIA, NICOLE BRONGO | : |
| KIWA NICOLE FORD, EXECUTRIX OF THE | : |
| ESTATE OF DECT. ERNEST GILBERT, | : |
| DECEASED, ESTATE OF DET. LAWRENCE | : |
| GERRRD, DECEASED, ROBERT J. MARANO, | : |
| ESQUIRE and JOHN DIDONATO, ESQUIRE | : |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See §1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)     Habeas Corpus - Cases brought under 28 U.S.C. §2241 through §2255.     (     )

(b)     Social Security - Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.     (     )

(c)     Arbitration - Cases required to be designated for arbitration under Local Civil Rule 53.2.     (     )

(d)     Asbestos - Cases involving claims for personal injury or property damage from exposure to asbestos.     (     )

(e)     Special Management - Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)     (     )

(f)     Standard Management - Cases that do not fall into any one of the other tracks.     (    X    )

| | | |
|---|---|---|
| 01/27/2022 | Joshua Van Naarden, Esquire | Plaintiff |
| Date | Attorney-at-Law | Attorney for |
| 215-960-0000 | 215-960-0384 | jvannaarden@vscplaw.com |
| Telephone | Fax Number | E-Mail Address |

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIE STOKES** | : | **CIVIL ACTION COMPLAINT** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO.** |
| | : | |
| **CITY OF PHILADELPHIA** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **NICOLE BRONGO KIWA NICOLE** | : | |
| **FORD, as Executrix of the Estate of** | : | |
| **DET. ERNEST GILBERT, Deceased** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **THE ESTATE OF DET. LAWRENCE** | : | |
| **GERRARD, Deceased** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **ROBERT J. MARANO, ESQUIRE** | : | |
| | : | |
| **AND** | : | |
| | : | |
| **JOHN DIDONATO, ESQUIRIE** | : | |
| | : | |
| **Defendants.** | : | **JURY TRIAL DEMANDED** |

## COMPLAINT – CIVIL ACTION

Plaintiff, Willie Stokes, by and through his attorneys, VSCP LAW, hereby alleges as follows:

1

## INTRODUCTION

1.      On January 4, 2022, Willie Stokes, Pennsylvania's longest incarcerated exoneree, now age 60, walked out of prison where he had been wrongfully incarcerated for thirty-seven (37) years for a crime that he did not commit.

2.      In a shocking "sex for lies" scheme to boost conviction rates and clear out cold cases, detectives with the Philadelphia Police Department, including Detectives Ernest Gilbert ("Gilbert") and Lawrence Gerrard ("Gerrard"), offered jailhouse informants the ultimate incentives — sex, drugs, and a reduced sentence — in exchange for adopting false and fabricated statements which were used to frame, arrest, prosecute, and incarcerate multiple innocent men, including Willie Stokes.

3.      Before having his conviction overturned by the Honorable Timothy Savage, who approved and adopted the report and recommendation of the Honorable Carol Sandra Moore Wells on December 30, 2021, for unequivocal violations of his constitutional civil rights, Willie Stokes was wrongfully prosecuted and convicted in 1984 for the murder of Leslie Campbell based on the testimony of witness Franklin Lee ("Lee"), who was promised *and provided* sex and drugs in exchanges for providing false testimony against Mr. Stokes.

4.      The Commonwealth not only knew that Lee's testimony against Willie Stokes was a lie – the Commonwealth then prosecuted Lee for perjury based on his false testimony against Mr. Stokes even though the prosecutors, including Defendants, Robert Marano, Esquire and John DiDonato, Esquire, used that same false testimony to secure a murder conviction against Mr. Stokes and sentence him to a life without parole.

2

5. The prosecutors never told Willie Stokes or his attorneys that they had prosecuted Lee for perjury for the same statements used to convict Mr. Stokes. It was not until 2015 – after Mr. Stokes had wasted thirty-one (31) years of life behind bars – that Mr. Stokes first learned of Lee's perjury conviction through the prison grapevine.

6. At a hearing on Willie Stokes' petition for *habeas corpus* relief, the Court found – *and the Commonwealth conceded* — that the prosecutors failed to turn over exculpatory evidence to Mr. Stokes and his attorneys and that "the suppression of this evidence fatally undermines confidence in [Willie Stokes'] conviction," and "violated [his] constitutional rights."[1] Further, the Commonwealth continued to "misrepresent[t] [..] the truth" during Willie Stokes' appeal of his conviction, and "[w]ithout the lie, the case would have failed at the preliminary hearing stage" and Mr. Stokes' wrongful conviction would not have occurred.

7. On January 27, 2022, after the Conviction Integrity Unit in the District Attorney's Office reviewed the case and Willie Stokes' claim of innocence, the District Attorney's Office requested that the Court enter a *nolle prosequi* pursuant to Pa.R.Crim.P. §585(a), which was granted by the Honorable Lillian Harris Ransom.

8. Tragically, Willie Stokes' case reveals the most egregious miscarriage of justice in this Commonwealth as no other Pennsylvania exoneree, and very few other exonerees in the nation, have been wrongfully incarcerated and deprived of their life and liberty for as many years as Mr. Stokes.

---

[1] See Order of the Honorable Carol Sandra Moore Wells, dated December 22, 2021, at pp. 18-19, in the matter of Stokes v. Lamas, et al., EDPA Docket No. 20-cv-2192.

3

9.    As the current Philadelphia District Attorney recognized, "[t]his remarkable case is marked by prosecutorial and policing practices that were too pervasive during the so-called tough-on-crime 1980s and 1990s, and unfortunately persist in far too many jurisdictions today. Prosecutors have an obligation to seek justice, and to redefine prosecutorial success, not by 'wins' in the form of convictions, but by accuracy and fairness in resolving criminal investigations and prosecutions." [2]

10.    This inexcusable tragedy is the direct result of egregious misconduct by Defendant-detectives Gilbert and Gerrard, who, at the time of Willie Stokes' wrongful incarceration, were employees of the Philadelphia Police Department ("PPD") and Defendant, City of Philadelphia ("City"). Specifically, to make their case against Mr. Stokes, Detectives Gilbert and Gerrard used irresistible incentives like offering drugs and providing women for sex with jailhouse informants in exchange for their agreement to adopt fabricated statements and then provide sworn testimony that they knew to be false.

11.    These false and coerced statements were used by Detectives Gilbert and Gerrard to secure convictions and close out unsolved homicides cases by any means necessary, rather than to actually solve the homicide cases – depriving both the victim and the wrongfully accused of justice.

12.    Defendants also withheld exculpatory evidence that would have demonstrated Willie Stokes' innocence and deliberately disregarded information and evidence that would have

---

[2] See Press release of the Philadelphia District Attorney's Office, dated January 3, 2022 (https://phillyda.org/news/with-dao-support-federal-court-vacates-1984-murder-conviction-of-willie-stokes/)

demonstrated flaws in the case against him, causing Mr. Stokes to spend nearly four (4) decades wrongly incarcerated for a murder that he did not commit.

13.     In a blatant recognition that the testimony used to convict Willie Stokes was a lie, Defendant Prosecutors, Marano and DiDonato, usurped the investigative role of law enforcement and charged their main witness, Lee, for perjury – not for his recantation and declaration at trial that his original incriminating statements against Willie Stokes were coerced, but for his original false, coerced, and incriminating statements against Mr. Stokes that the prosecutors had asked a jury to believe and rely upon to convict Mr. Stokes of murder.

14.     "Mr. Stokes' ordeal over nearly four decades of filing relief petition after relief petition, only to be rejected on procedural bases and without all of the evidence the Constitution says he was owed from the Commonwealth, underscores the urgency of the criminal legal system seeking justice over finality," as stated by DA Krassner.[3]

15.     Willie Stokes' wrongful conviction was also the direct result of the unconstitutional and improper polices, practices and customs of the PPD, specifically including the Homicide Unit, and the unconstitutional actions of the individual Defendants.

16.     These unconstitutional and egregious policies, practices and customs have persisted for a significant period of time, which continued throughout this investigation, and for years thereafter, demonstrates the deliberate indifference of Defendant City to practices or outrageous police misconduct, including, but not limited to, coercion of witnesses, witness intimidation, the suppression of exculpatory evidence and a pervasive abuse of authority and power.

---

[3] Id.

## JURISDICTION AND VENUE

17.    This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.

18.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

19.    Willie Stokes demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure §38(b).

## PARTIES

20.    Plaintiff, **WILLIE STOKES**, is, and at all times relevant to this Complaint was, a resident of the Commonwealth of Pennsylvania.  In August 1984, Mr. Stokes was wrongfully convicted of the 1980 murder of Leslie Campbell and, as a result, served over thirty-seven (37) years in custody, until previously withheld exculpatory and admittedly false evidence provided a basis for his exoneration. Mr. Stokes was finally released on January 4, 2022, after his conviction was vacated by a federal judge.

21.    Defendant, **CITY OF PHILADELPHIA**, is, and at all times relevant to this Complaint was, a municipality located in the Commonwealth of Pennsylvania.  Defendant City was, at all times relevant to this Complaint, officially responsible for the policies, practices, and customs of the PPD, and was the employer of the individual PPD Defendants in this matter.

6

22.     Defendant, Nicole Brongo Kiwa Nicole Ford, Executrix of the Estate of **ERNEST GILBERT,** deceased, is the representative of Ernest Gilbert, deceased (hereinafter referred to as "Detective Gilbert" or "Defendant Gilbert") who was at all times relevant to this Complaint, was an officer of the PPD acting under color of law and pursuant to the ordinances, regulations, policies, customs, and usage of Defendant City and the PPD.  The claims against the Estate of Earnest Gilbert are made against Decedent in his individual capacity.  Upon information and belief, Defendant Gilbert was assigned as a Detective with the Homicide Unit of the PPD at the time of the investigation into the murder of Leslie Campbell and the wrongful conviction of Willie Stokes.

23.     Defendant, Estate of **LAWRENCE GERRARD,** deceased, is the representative of Lawrence Gerrard, deceased (hereinafter "Detective Gerrard" or "Defendant Gerrard") who was at all times relevant to this Complaint, an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Defendant City and the PPD.  The claims against the Estate of Lawrence Gerrard are made against Decedent in his individual capacity. Upon information and belief, Defendant Gerrard was assigned as a Detective with the Homicide Unit of the PPD at the time of the investigation into the murder of Leslie Campbell and the wrongful conviction of Willie Stokes.

24.     Defendants, Estate of Lawrence Gerrard, deceased and Nicole Brongo Kiwa Nicole Ford, Executrix of the Estate of Ernest Gilbert**,** deceased, may sometimes be collectively referred to as "Detective-Defendants."

25.     Defendant, **ROBERT J. MARANO, ESQUIRE,** (hereinafter sometimes referred to as "ADA Marano") at all times relevant to this Complaint was an Assistant District Attorney

("ADA") of the Philadelphia District Attorney's Office ("DAO"), acting under color of state law. These claims are brought against Defendant Marano for the performance of investigatory and/or administrative actions, outside the scope of his duties as a prosecutor. Defendant Marano is sued in his individual capacity. Upon information and belief, Defendant Marano was assigned as a prosecutor to the Homicide Division of the DAO at the time of the investigation into the murder of Leslie Campbell, the wrongful conviction to Willie Stokes, and the investigation and prosecution of Lee for perjury.

26.    Defendant, **JOHN DIDONATO, ESQUIRE**, (hereinafter sometimes referred to as "ADA DiDonato") at all times relevant to this Complaint was an ADA of the DAO, acting under color of state law. These claims are brought against Defendant DiDonato for the performance of investigatory and/or administrative actions, outside the scope of his duties as a prosecutor. Defendant DiDonato is sued in his individual capacity. Upon information and belief, Defendant DiDonato was assigned as a prosecutor to the Homicide Division of the DAO at the time of the investigation into the murder of Leslie Campbell, the wrongful conviction of Willie Stokes, and the investigation and prosecution of Lee for perjury.

27.    Willie Stokes' claims against Defendants DiDonato and Marano are based on the prosecutors' performance of solely investigatory actions and/or administrative actions, thus stripping them from the immunities provided to them as prosecutors.

28.    Defendants DiDonato and Marano are sometimes collectively referred to as "Prosecutor-Defendants" throughout this Complaint.

29.     Defendants, Detective Gilbert, Detective Gerard, ADA Marano and ADA DiDonato, are sometimes collectively referred to as "individual Defendants" throughout this Complaint.

30.     At all times relevant to this Complaint, the individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Willie Stokes of his constitutionally protected rights.

## FACTUAL BACKGROUND

31.     On October 1, 1980, Leslie Campbell was murdered when someone shot into a crowd of people playing dice at the corner of 30th Street and Girard in Philadelphia, PA.

32.     There were no immediate arrests made, no leads were developed, and the case quickly went cold.

## SEX FOR LIES

33.     Four (4) years later, Lee was arrested as a suspect on unrelated homicide and rape charges.

34.     While Lee was being held on his own charges and facing a potential life sentence, Detectives Gilbert and Gerrard, both assigned to a book of cold cases in the Homicide Unit, sent a police vehicle to transport Lee from his jail cell to the Police Administration Building at 8th and Race Streets in Philadelphia, often referred to as the "Roundhouse."

35.     There, Detectives Gilbert and Gerrard came in with several cold case files, one of which involved the murder of Leslie Campbell. The detectives told Lee that they were trying to

"clear the books" on homicide cases that remained unsolved and promised Lee that if he helped them, they would return the favor in a big way.

36.     When Detectives Gilbert and Gerrard first asked Lee what he knew about Willie Stokes' involvement in the murder of Leslie Campbell, Lee said "I don't know anything about that" which the detectives rejected, saying "that's not what we want."

37.     Detectives Gilbert and Gerrard then instructed Lee to fabricate a statement that he had heard Willie Stokes boast about getting away with the murder.

38.     In return for fabricating this false statement Lee was not only promised leniency on his own sentence, but also promised drugs and sex – arranged for by Detectives Gilbert and Gerrard.

39.     If Lee refused to go through with the fabricated statement, Detectives Gilbert and Gerrard threatened to arrange a harsher sentence for Lee and frame him for additional convictions.

40.     With no real choice, Lee took the deal and Detectives Gilbert and Gerrard delivered on their promise: providing Lee an empty police interrogation room where he could have sex with women.

41.     The women were freely permitted to bring in drugs and money during these sessions with Lee.

42.     Visitation logbooks confirm that Lee's then-girlfriend, Charmaine Paschall, came to visit him at the Police Administration Building and she later testified that while on her visit, she did have sex with him in one of the empty interrogation rooms.

43.    When Ms. Paschall became uncomfortable with the arrangement and refused to show up for another sexual rendezvous with Lee, Detectives Gilbert and Gerrard actually produced another woman to come in and have sex with inmate Lee in a police interrogation room at the Philadelphia Police Administration Building.

44.    Meanwhile, Lee's false statement incriminating Willie Stokes in the murder of Leslie Campbell was used to charge and arrest Mr. Stokes in March 1984.

## FALSE TESIMONY AT THE PRELIMINARY HEARING

45.    During Willie Stokes' preliminary hearing on May 30, 1984, Lee testified, as he had been coerced by Defendants to do, that Mr. Stokes had admitted to killing Leslie Campbell.

46.    Specifically, Lee testified at the preliminary hearing that he was hanging out with Willie Stokes years after the murder of Leslie Campbell, and that Mr. Stokes bragged about getting away with the murder.

47.    This testimony was consisted with the statement which Detective-Defendants had drafted for Lee to sign and adopt, as part of the "sex for lies" deal.

48.    Willie Stokes was held over for trial based on the testimony of Lee at his preliminary hearing.

## THE TRUTH AT TRIAL

49.    At Willie Stokes' trial, Lee was called by the Commonwealth to reiterate the statements he made against Mr. Stokes at the preliminary hearing when he swore under oath that Willie Stokes confessed to him that he had murdered Leslie Campbell.

50.     However, when Lee took the stand at trial, he refused to repeat his accusation against Willie Stokes and recanted his prior inculpatory statement.

51.     Lee testified at trial that his prior statement at the preliminary hearing was untrue and that he made the false statements because he was threatened by the Detective-Defendants and scared of the consequences.

52.     The prosecutor, Defendant DiDonato, engaged in a detailed cross-examination, using Lee's prior statement, prior testimony and lengthy criminal history to challenge the credibility of his recantation.

53.     Lee continued to recant saying "the police made me make this statement," and "[t]hey said if I didn't cooperate with them, they would talk to Judge [Albert] Sabo and hang me."[4].

54.     Lee's prior statement to the police and his testimony at the preliminary hearing were both read into the record and then repeated and relied upon by Defendant DiDonato during closing arguments to the jury.

55.     Defendant DiDonato urged the jury to reject Lee's testimony at trial and accept his preliminary hearing testimony — the testimony that accused Willie Stokes of bragging about getting away with murder — as the truth.

56.     Defendant DiDonato asked the jury to believe Lee's preliminary hearing testimony, even though Lee had testified at the trial that his statements against Willie Stokes, made at the preliminary hearing, were false and the product of coercion.

---

[4] After Lee recanted, he was sentenced to thirty-five (35) years on his open cases.

57.    With little else to rely upon other than the preliminary testimony of Lee, the jury convicted Willie Stokes of murder in the first degree.

## A CONVICTION BASED ON PERJURY

58.    Nine (9) days after securing the conviction against Willie Stokes, Defendants DiDonato and Marano, furious that Lee had recanted, decided to take matters into their own hands.

59.    In retaliation for Lee's recantation, Defendants DiDonato and Marano stepped outside the bounds of their prosecutorial power and into the shoes of an investigator and crafted *and signed* a criminal Complaint – instead of allowing it to be investigated and prepared through proper channels of law enforcement — so that they could then prosecute Lee for committing perjury.

60.    Shockingly, Defendants DiDonato and Marano acknowledged in the charging document against Lee for perjury that his perjurious statements were not the statements he made at trial recanting his accusations against Willie Stokes, but rather, that his perjurious statements were the false accusations he made against Willie Stokes at the preliminary hearing when he falsely claimed that Willie Stokes had confessed to the murder.

61.    Defendants DiDonato and Marano knowingly used the false testimony of Lee to convict Willie Stokes, but then charged and convicted Lee for perjury following Willie Stokes' conviction.

62.    At trial, Defendant DiDonato stood in front of a jury, while Defendant Marano sat in the back of the courtroom, and asked the members of the jury to discredit Lee's recantation but

to accept his preliminary hearing testimony as truth — the testimony which accused Willie Stokes of confessing to the murder.

63.     Nine (9) days later, Defendant Marano affirmed the veracity of a criminal complaint, which claimed that the statements his colleague, Defendant DiDonato, had argued to be true and used to convict Willie Stokes, were actually false statements warranting criminal action for perjury against Lee.

64.     Defendant Marano signed the criminal complaint as the complaining witness accusing Lee of perjury as follows:

65.     In the perjury Complaint against Lee, Defendant Marano describes the act of

perjury as follows:

> On May 30, 1984, the defendant [Franklin Lee] was sworn and
> testified before the Honorable Arthur Kaffrissen in courtroom 675
> City Hall and testified that he was told by Willie Stokes that he
> (Willie Stokes) shot and killed Leslie Campbell. On 8/20/84 the
> defendant was again sworn in front of Judge Malmed in courtroom
> 654, City Hall, Phila., PA. and stated that he lied on 5/20/84 in
> courtroom 675, City Hall, in violation of PA. Penal Laws…"

See **Exhibit A**.

66.     The Information goes on to charge Lee with making a false statement under oath

during the preliminary hearing on May 30, 1984, wherein Lee "stated Willie Stokes told him he

killed Leslie Campbell."

COMMONWEALTH OF PENNSYLVANIA                   In the Common Pleas Court of the County of Philadelp
COUNTY OF PHILADELPHIA        ss.                            CRIMINAL SECTION

THE DISTRICT ATTORNEY OF PHILADELPHIA COUNTY BY THIS INFORMATION CHARGES—

FIRST COUNT —THAT ON OR ABOUT          MAY 30 , 1984
IN PHILADELPHIA COUNTY,
                                        FRANKLIN LEE
        IN AN OFFICIAL PROCEEDING, UNDER OATH OR EQUIVALENT
        AFFIRMATION, FELONIOUSLY DID MAKE A FALSE STATEMENT, OR SWEAR
        OR AFFIRM THE TRUTH OF A STATEMENT PREVIOUSLY MADE, WHEN THE
        STATEMENT WAS MATERIAL AND THE DEFENDANT DID NOT BELIEVE IT TO
        BE TRUE.

        OFFICIAL PROCEEDING --   PRELIMINARY HEARING ON MAY 30, 1984

        OATH OR EQUIVALENT AFFIRMATION --   OATH SWORN TO BEFORE JUDGE KAFRIS

        FALSE STATEMENT --       DEFENDANT STATED WILLIE STOKES TOLD HIM HE
        KILLED LESLIE CAMPBELL.

        MATERIALITY --   WILLIE STOKES WAS CONVICTED OF MURDER.

        BELIEF OF DEFENDANT --   DEFENDANT KNEW WILLIE STOKES HAD NOT MADE
        SUCH A STATEMENT.

15

67.     This false statement was a critical and material part of the wrongful prosecution against Willie Stokes, as Defendant Marano acknowledged in the Complaint against Lee stating: "Materiality – Willie Stokes was Convicted of Murder." <u>See</u> Exhibit A.

68.     Egregiously, Defendants DiDonato and Marano were aware that the false statement made by Lee, had been fabricated and coerced by Detective-Defendants.

69.     Defendants DiDonato and Marano knowingly used the false testimony of Lee to convict Willie Stokes, then prosecuted and convicted Lee for perjury following Willie Stokes' conviction.

70.     It was not the role of a prosecutor in the Homicide Unit of the DAO to sign as the affiant on a criminal Complaint as the "complaining witness."

71.     Rather, it was the role of a detective or law enforcement officer to draft and sign as the affiant, a criminal Complaint.

72.     However, Defendants DiDonato and Marano decided to act as investigators in their pursuit of obtaining evidence against Lee for use against him in a prosecution for perjury.

73.     Further, Defendants DiDonato and Marano intentionally circumvented the proper channels of investigation and administration so to conceal their actions, and the truth, from Willie Stokes.

74.     In doing so, Defendants DiDonato and Marano deliberately refused to submit the paperwork containing information about Lee's perjury charge and conviction to Willie Stokes' homicide file so that Mr. Stokes might never discover that the prosecutors knew his conviction was based on lies.

75.    Willie Stokes was convicted of murder on August 21, 1984.

76.    Lee was charged with perjury on August 29, 1984.

77.    Lee plead guilty to perjury on January 14, 1985, and received the maximum sentence under the law.[5]

78.    Prior to his sentencing hearing, Willie Stokes requested the production of mitigating information in the possession of the DAO.

79.    However, because Defendants DiDonato and Marano specifically prevented the administrators in the DAO from adding information about Lee's perjury conviction to Willie Stokes' homicide file, neither Mr. Stokes nor the sentencing Judge had this information available to them at Mr. Stokes' sentencing hearing.

80.    Unbelievably, none of this was made known to Willie Stokes as he languished in a prison cell until September 29, 2015, *thirty-one* (31) years after Defendant Marano signed his name to a Complaint affirming that he and the DAO had knowledge that Lee's incriminating statement against Mr. Stokes was false.

81.    Thirty-seven (37) years later, the Commonwealth finally admitted that it failed to disclose this exculpatory evidence, and that in so doing, violated Willie Stokes' constitutional

---

[5]    The Honorable Carol Sandra Moore Wells found the testimony presented at Mr. Stokes' *habeas* hearing in November 2021, to be "extremely credible in supporting the veracity of Mr. Lee's evidentiary hearing testimony that he pled guilty to the charges in the bill of information rather than at trial." Further the Commonwealth conceded that "Mr. Lee's evidentiary hearing testimony [at Mr. Stokes' *habeas* hearing] was credible" and "the best available evidence suggests that Mr. Lee pled guilty to perjuring himself at Petitioner's preliminary hearing" as noted by the Judge in her December 22, 2021 Order.  See Order of the Honorable Carol Sandra Moore Wells, dated December 22, 2021, at pp. 18-19, in the matter of <u>Stokes v. Lamas, et al.</u>, EDPA Docket No. 20-cv-2192.

rights and "fatally undermin[ed] confidence in [Mr. Stokes'] conviction," as stated by Judge Wells.[6]

## **AN ARDUOUS APPEALS PROCESS DEPRIVED OF THE TRUTH**

82.     Willie Stokes immediately exercised his appellate rights and relentlessly fought to overturn his conviction, all the while maintaining his innocence.

83.     The information of Lee's perjury charge was never disclosed to Willie Stokes or his attorneys, and therefore was never included in Mr. Stokes' decades of submitted appeals.

84.      On or about September 29, 2015, Willie Stokes received a letter from fellow inmate, Gerald Sanders, informing Mr. Stokes that the DAO had charged Lee with perjury for his inculpatory testimony against Mr. Stokes.

85.     The letter included a letter from Lee received by Mr. Sanders.

86.     After receiving the information from Mr. Sanders, Willie Stokes arranged to obtain a copy of the information and criminal docket report.

87.     Successive appellate petitions were filed and ultimately a hearing was granted and occurred on November 9, 2021.

88.     Lee testified at the hearing, maintaining that he was coerced into adopting the fabricated accusations against Willie Stokes and decided to come clean when testifying at Mr. Stokes' trial, after enduring enormous feelings of guilt.

---

[6] See Order of the Honorable Carol Sandra Moore Wells, dated December 22, 2021, at pp. 18-19, in the matter of Stokes v. Lamas, et al., EDPA Docket No. 20-cv-2192.

89.     Finally, on December 30, 2021, Willie Stokes' *habeas corpus* Petition for relief was granted and his conviction was overturned.

90.     The prosecution finally terminated in Willie Stokes' favor on January 27, 2022, after his conviction was vacated and the prosecution's request for *nolle prosequi* on all charges was granted.

## THE SEX FOR LIES SCHEME DID NOT BEGIN WITH LEE

91.     Lee was not the only jailhouse informant who was promised sex in exchange for false testimony for convictions by Detectives Gerrard and Gilbert.

92.     The PPD knew such arrangements were being offered to obtain false confessions and that their witness interrogation rooms were serving as private rooms for sex, and nothing was done to stop it.

93.     In fact, in 1990, the Superior Court of Pennsylvania specifically identified this outrageous scheme perpetrated by Detectives Gerrard and Gilbert in a published opinion detailing the false confession of Arthur Lester who had sex with three separate women at the PPD Roundhouse, as promised by the Detectives in exchange for his own confession to a murder which was eventually found to be coerced under the circumstances and the resulting conviction was overturned. Commw. v. Lester, 572 A.2d 694 (Pa. Super. Ct. 1990).

94.     At a post-conviction hearing, "[t]he women testified that they went to the Police Administration Building, met with Detectives Gerrard and/or Gilbert, signed the logbook, and were escorted to Lester's room" (at the Police Administration Building).  Id.

95.     The detectives not only provided "private" rooms for these sexual encounters, but they actively secured women for jail informants to have sex with so that their coercive tactics continued to carry power.

96.     Lee explained that on one occasion, Detectives Gilbert and/or Gerrard slipped two (2) condoms into his hand moments before leading Lee to a room where a woman was waiting for him.

97.     Willie Stokes is one of several other men who remained wrongfully imprisoned because of testimony from informants who were also coerced into making statements in exchange for sex.

98.     Williams Franklin and Major Tillery, who are both in their 70s and serving out life terms for a 1976 murder, were identified by witness Emanuel Clait, who was promised a short sentence on his own convictions and the prospect of sexual encounters with four (4) women in exchange for testimony implicating Franklin and Tillery.

99.     Emanuel Clait has since admitted that he was coached by prosecutors and PPD detectives, including Detectives Gilbert and Garrett, to testify against Franklin and Tillery and threatened with being framed for another murder if he recanted.

100.    Detectives Gilbert and Gerrard were involved in that investigation and the "sex for lies" deal made with informants.

101.    Other detectives from the PPD were also involved in this investigation, including Detectives Leon Lubiejewski, William Shelton, John Cimino, and James McNesby.

102.    This scheme—promising sex in exchange for lies against innocent men—was in effect years before Leslie Campbell was ever murdered.

103.    Yet, none of these six (6) detectives involved in the "sex for lies" scheme, which began years before Willie Stokes got caught in this nightmare, did anything to stop it. To the contrary, they continued and encouraged this effective pattern and practice of securing convictions at all costs and with no regard for justice or truth.

104.    In 1982, three (3) men who have maintained their innocence (Andre Harvey, Howard White and Russell Williams) were convicted on the statements of Charles Atwell, who, while in custody on his own charges, was offered the same deal by Detectives Gilbert and Gerrard.

105.    In a 1997 hearing, Atwell's girlfriend, Maxie Harris, testified that she made eight (8) visits to meet him at the Police Administration Building to have sex with Atwell in interrogation rooms. On one (1) occasion, Atwell's nephew, who was brought down to the Police Administration Building with Atwell, unintentionally walked in on his uncle, Atwell, having sex in an interview room, and testified to this account at that same 1997 hearing.

106.    Despite knowledge of this pattern, practice and custom of coercing confessions, nothing was done by the PPD to stop these unconscionable abuses of power and disrespect for the Constitutional rights of others, including Willie Stokes, from occurring within the walls of Philadelphia's own Police Department buildings.

107.    The PPD was aware of and allowed this pattern, practice and custom of using sex to incentives jail informants to adopt false statements in order for homicide detectives assigned to cold cases to secure convictions and tout high conviction statistics.

### THE PPD'S PATTERN AND PRACTICE OF UNCONSTITUTIONAL MISCONDUCT IN HOMICIDE INVESTIGATIONS, INCLUDING THE FABRICATION OF EVIDENCE, COERCION AND SUGGESTION OF FALSE STATEMENTS FROM WITNESSES AND SUSPECTS, AND SUPPRESSION OF EXCULPATORY EVIDENCE

108.    The PPD has exhibited a pervasive pattern and practice of unconstitutional misconduct in their homicide investigations, including coercion of false statements from witnesses and suppression of exculpatory and inconsistent evidence, that dates back to at least the early 1970's and has continued beyond the Defendants' investigation and prosecution of Willie Stokes.

109.    For many years, dating back at least to the 1970's, and continuing well beyond the time of the investigation of Leslie Campbell's murder, Defendant City had, in force and effect, a policy, practice or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain statements, fabricating inculpatory evidence and withholding exculpatory evidence.

110.    At the time of the investigation and prosecution of Willie Stokes, the PPD had a policy, practice or custom involving the use of various techniques to coerce false statements, including, but not limited to, subjecting witnesses to needlessly prolonged interrogations and interviews, failing to record interviews/interrogations, isolation, making promises, regardless of their truthfulness, threatening charges for unrelated misconduct, offering assistance in unrelated criminal matters, interviewing witnesses while they are under the influence of drugs that make

them more susceptible to coercion, and assertions that the witness will benefit from making a statement that assists the police or suffer some sort of disadvantage if they refuse.

111.    At the time of the investigation and prosecution of Willie Stokes, the PPD had a policy, practice or custom involving the use of various techniques to suppress and/or withhold exculpatory or inconsistent statements and evidence, in violation of their known duty under Brady, including, but not limited to, making false statements to prosecutors about the existence of evidence, failing to provide complete Homicide files to prosecutors, coercing witnesses into keeping exculpatory and inconsistent information from prosecutors, disregarding or deleting exculpatory and inconsistent information from Homicide files, ignoring exculpatory and inconsistent information so that there is no record to be deleted from Homicide files, threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying and deleting information of key exculpatory witnesses so that they do not testify at trial.

112.    This policy, practice or custom involved the use of various techniques to coerce inculpatory statements, including, without limitation, isolation, separating juvenile or otherwise vulnerable suspects or witnesses from their friends and family, subjecting individuals to needlessly prolonged interrogations, making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement, the use or threat of physical violence, authoritative assertions of a suspect's guilt, including, without limitation, confrontation with false inculpatory evidence, and providing false assurances that the suspect will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

113.    This policy, practice or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation, providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication, taking misleading steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation, selectively documenting a witness or suspect's eventual statement and not the preceding interrogation, preparation and rehearsal, and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words.

114.    These practices were well known to Defendant City, and its policymakers, with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977-1978, governmental investigations, complaints from lawyers and civilians, and internal police investigations, including the PPD's 39th District Corruption Scandal in the 1990's, complaints lodged by the public, prior litigation and internal police investigations.

115.    The 39th District Corruption Scandal involved widespread unconstitutional practices that were not appropriately addressed or remediated despite pervasive knowledge throughout the PPD and Defendant City.  The police misconduct in the 39th District Corruption Scandal included constitutional violations that mirror those violations suffered by Willie Stokes, including omission of material information and suppression of exculpatory evidence, physical abuse and coercive interrogation tactics, and false allegations of criminal conduct.  The PPD was deliberately indifferent to the officer's misconduct and credible complaints to their internal compliance department were disregarded.

24

116.    Various cases demonstrate that this misconduct was pervasive within the PPD at time of the investigation into Leslie Campbell's murder and the subsequent prosecution of Willie Stokes.  This misconduct was pervasive within the PPD's Homicide Unit before and after its investigation of Willie Stokes and, upon information and belief, the misconduct described in this Complaint was expressly or tacitly committed or deliberately ignored when committed in the presence of the Homicide Unit and the PPD supervisors or because of their deliberate indifference to this misconduct.

117.    Numerous other convictions that later resulted in exonerations demonstrate the pervasive patterns, practices and customs of official misconduct within the Homicide Unit of the PPD include:

        a.       **Raymond Carter**
        b.       **Anthony Wright**
        c.       **Eugene Gilyard**
        d.       **Lance Felder**
        e.       **Carlos Hernandez**
        f.       **Ed Williams**
        g.       **Jackie Combs, Jr.**
        h.       **Willie Veasy**
        i.       **Percy St. George**
        j.       **Jimmy Dennis**
        k.       **Donald Ray Adams**
        l.       **Andrew Swainson**
        m.       **Walter Ogrod**
        n.       **James Dennis**
        o.       **Shaurn Thomas**
        p.       **Terrance Lewis**
        q.       **Donald Outlaw**
        r.       **James Frazier**
        s.       **Christopher Williams**
        t.       **Chester Holman**

118.    As a result of a pattern of police misconduct that was in effect at the time of the investigation of the murder of Leslie Campbell for which Willie Stokes was charged, the United

States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of <u>NAACP v. City of Philadelphia</u> requiring widespread reforms in the PPD, while also limiting certain aspects of their investigative practices and policies.

119.    This practice, as exemplified by the investigation into Willie Stokes' wrongful conviction, and those detailed hereinabove, continued for years due to the deliberate indifference of the PPD and Defendant City to these policies, practices and customs.

120.    During the 1980's and early 1990's, and concurrent with the time of the investigation and prosecution of Willie Stokes by the PPD, there was, within the PPD a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three (3) separate occasions in the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices:

    a.    **Cliett v. City of Philadelphia:**  Consent decree arising out of "Operation Cold Turkey", that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices);

    b.    **Spring Garden Neighbors v. City of Philadelphia:**  Enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation);

    c.    **Arrington v. City of Philadelphia:** Enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

121.    At the time of the investigation and prosecution of Willie Stokes, the PPD had a practice, policy and custom of:

    a.    Engaging in unlawful interrogation of suspects, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, and failing to disclose exculpatory evidence;

    b.    Allowing detectives to engage in illegal and coercive tactics to secure evidence in homicide cases.

c.  Allowing detectives to use promises of sex and drugs to coerce jailhouse informants into adopting fabricated statements for use as evidence in homicide cases.

d.  Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

e.  Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

f.  Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and Defendants, including unlawful police interrogations, searches, arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence;

g.  Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging PPD police, including the Defendants in this case, to violate the rights of citizens, such as Willie Stokes.

122.    At the time of the investigation and prosecution of Willie Stokes, and for many years before and thereafter, the PPD and Defendant City has been deliberately indifferent to the need to train, supervise and discipline police officers.  The Internal Affairs Division ("IAD") of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.  excessive and chronic delays in resolving disciplinary complaints;

b.  a lack of consistent, rational and meaningful disciplinary and remedial actions;

c.  a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.  the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e.  the PPD discipline, as practiced, was incident-based rather than progressive, thus, repeat violators were not penalized in proportion to the number of violations;

f.  the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.    a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.    serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.    lack of an effective early warning system to identify, track and monitor "problem" officers;

j.    IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.    IAD failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

123.    The PPD's conduct in this case was not an isolated incident and was instead the result of customs, policies and practices of the PPD prior to and at the time of the unlawful investigation into the murder at issue. The PPD, by and through its final policy makers, maintained an official policy, pattern, practice, or custom of suppressing coercing confessions and fabricating evidence in violation of Willie Stokes' and others' constitutional rights.

124.    Further, the PPD failed to train, educate, and supervise officers including Detective Defendants regarding proper conduct in police work and investigations. Thus, the Defendant Detectives and the PPD officers were inadequately educated and trained about their constitutional and ethical responsibilities to criminal defendants. The lack of oversight of Defendant Detectives and other homicide detectives in the PPD by the PPD compounded the constitutional violations by eliminating any mechanism by which such violations would be identified and rectified.

125.    Yet, the PPD and Defendant City, by and through its final policymakers, implemented the policy, practice and customs of coercing jailhouse informants or other criminal defendants into adopting fabricated statements for use in prosecuting and convicting persons of

28

interest in deliberate indifference to the substantial likelihood that these customs, practices, and policies would result in constitutional violations like those that occurred in Willie Stokes' case.

126.    Such policies, customs and practices of the PPD were the moving force behind the fabricated and coerced statement of Lee, and its unlawful use in the conviction and imprisonment of Willie Stokes.

## DEFENDANTS DIDONATO AND MARANO USURPED THE INVESTIGATIVE ROLE OF LAW ENFORCEMENT IN CHARGING LEE WITH PERJURY

127.    At all times relevant, the Homicide Unit of the DAO is, and remains, an elite unit, staffed with senior trial prosecutors.

128.    Prosecutors in the Homicide Unit generally did not concern themselves with low-level felony cases such as charges of perjury.

129.    At all times relevant, Prosecutors in at any level of the DAO did not draft or sign the charging document against criminal defendants.

130.    Law enforcement officers who investigated the crime were responsible for drafting the charges against an arrestee and verifying the document by signing as the affiant.

131.    In this case, the complaining document charging Lee with perjury was drafted and signed by Defendant Marano on August 29, 1984.

132.    Before signing and submitting the perjury charge against Lee, Defendants DiDonato and Marano stepped into an investigative role to obtain information to be used in the Complaint and served as both witnesses and evidence collectors in the charging document against Lee.

133.    None of this was part of the duties and responsibilities of Defendants DiDonato and Marano in their capacity as prosecutors.

## DEFENDANTS DIDONATO AND MARANO ACTED IN AN ADMINISTRATIVE CAPACTY IN SUPPRESSING EXCULPATORY INFORMATION FROM DISCOVERY BY WILLIE STOKES

134.    At all times relevant, prosecutors in the Homicide Unit were not involved in the administrative record-keeping process related to homicide files.

135.    Defendants DiDonato and Marano usurped the role of administrators when they refused to submit information related to Lee's perjury conviction to Willie Stokes' homicide file.

136.    Had they allowed this information to be handled by administrative staff, the information about Lee's conviction would have been included in Willie Stokes' homicide file.

137.    Because Defendants DiDonato and Marano specifically withheld this paperwork from being added to Willie Stokes' file, the information was not provided to Mr. Stokes' attorneys when requests for mitigating information were received, prior to Mr. Stokes' sentencing hearing.

138.    Because Defendants DiDonato and Marano specifically withheld this paperwork from being added to Willie Stokes' file, the information was not provided to Mr. Stokes' attorneys during his post-conviction relief discovery requests.

139.    Had this information been timely provided to Willie Stokes, as it would have if Defendants DiDonato and Marano had not usurped the responsibility of the administrative staff, Mr. Stokes would not have wasted thirty-seven (37) years of his life in prison for a crime that his prosecutors knew he did not commit.

140.    The actions of Willie Stokes were conducted in an administrative capacity and not in furtherance of their duties and responsibilities as prosecutors.

141.    Additionally, in an effort to avoid <u>Brady</u> obligations, and with deliberate disregard for Willie Stokes' constitutional rights, Defendants DiDonato and Marano instructed PPD personnel to keep documentation of exculpatory and impeachment evidence in their exclusive possession.

142.    Although Defendants DiDonato and Marano were made aware of the exculpatory and impeachment evidence related to the circumstances of Lee's incriminating statement against Willie Stokes, Defendants DiDonato and Marano prevented physical documentation of such evidence from being transmitted to the DAO through proper channels.

143.    Defendants DiDonato and Marano knew that if documentation of such information was transmitted to the DAO as a typical case, it would be placed in the homicide file for Willie Stokes, thereby triggering disclosure the of exculpatory evidence.

144.    Because <u>Brady</u> obligations related to disclosure of exculpatory evidence did not extend to police officers, the PPD personnel were instructed to keep certain exculpatory information in their exclusive possession.

145.    By instructing the PPD personnel to keep documentation of such evidence in their exclusive physical possession, Defendants DiDonato and Marano attempted to avoid <u>Brady</u> obligations and withhold such information form Willie Stokes' attorneys during the course of discovery.

146.    In a separate post-conviction hearing for another wrongfully convicted and incarcerated man, Christopher Williams, an Assistant District Attorney testified that material like activity sheets of the PPD were not passed or transmitted to the DAO "as a matter of course," a

fact which was stipulated to by the Commonwealth during Mr. Williams' post-conviction litigation.

147.    Similarly, although information was passed between the homicide ADAs and homicide detectives in this case, the ADAs prevented such information from being filed in their own files, so that it would not be passed on to Willie Stokes' attorneys through the administrative discovery process.

148.    At the time of the arrest and prosecution of Willie Stokes, the DAO intentionally lacked an "open file" discovery policy. Thus, each assistant district attorney, functioned as their own discovery clerk and, determined which information would be withheld or produced.

149.    The instructions related to proper filing, transmissions, and exchange of documents were made by Defendants DiDonato and Marano in an administrative capacity and not in their capacity as prosecutors advocating for the Commonwealth.

150.    The actions of Defendants DiDonato and Marano caused the exculpatory and impeachment evidence related to Lee's inculpatory statements were suppressed from Willie Stokes during his prosecution and sentencing. Additionally, the actions of Defendants DiDonato and Marano caused the exculpatory and mitigating evidence related to the perjury conviction for Lee to be suppressed from Willie Stokes during his sentencing hearing and post-conviction efforts.

## **DAMAGES**

151.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and Defendant City, caused Willie Stokes to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, sentenced to life without parole, and forced to serve over thirty-seven (37) years in prison for a brutal crime he did not commit.

152.    As a direct result of Defendants' conduct and omissions, Willie Stokes sustained injuries and damages, including loss of his freedom for more than thirty-seven (37) years of his youth and adult life, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological and vocational development, and restrictions on all forms of personal freedom including, but not limited to, diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic/physical opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, church, travel, community engagement, religious and spiritual activity, exposure and adaptability to technological advancements, enjoyment, and freedom of speech and expression.

153.    As a direct result of Defendants' conduct and omissions, Willie Stokes was deprived of: his familial relationships including the opportunity to provide guidance and tutelage to his children, attendance at his nineteen-year-old daughter's funeral, ability to grieve with family over the loss of his daughter, attendance at the funeral of his step-father (who was his father-figure), ability to grieve with family over the loss of his father-figure, and countless birthdays, weddings, deaths, births, and other significant milestones in his own life and the life of his family, which Mr. Stokes was deprived of as he sat in a jail cell for a crime that he did not commit.

154.    As a direct result of Defendants' conduct and omissions, Willie Stokes sustained economic injuries and damages, including decades of loss of income and loss of career opportunities.

155.    As a direct result of Defendants' conduct and omissions, Willie Stokes sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness and inadequate medical care.

33

156.    As a direct result of Defendants' conduct and omissions, Willie Stokes was forced to suffer the emotional pain and suffering of a protracted appellate process and numerous evidentiary hearings that ultimately resulted in his exoneration, but not before wasting decades of his life sitting in prison as an innocent man whose Constitutional rights were violated.

## COUNT I: 42 U.S.C. §1983
## Malicious Prosecution in Violation of the Fourth Amendment

157.    Plaintiff incorporates by reference all of the foregoing paragraphs.

158.    The individual Defendants, acting individually and in concert with malice, and knowing that probable cause did not exist to prosecute Willie Stokes for Leslie Campbell's murder, intentionally caused Mr. Stokes to be arrested, charged and prosecuted for those crimes, thereby violating Mr. Stokes's clearly established right, under the Fourth Amendment of the U.S. Constitution, to be free of prosecution absent probable cause.

159.    Defendants knowingly used the false testimony of Lee to convict Willie Stokes and then prosecuted and convicted Lee for perjury following Mr. Stokes' conviction which was based on Lee's false and perjurious testimony.

160.    Lee's false statement was used to obtain probable cause for Willie Stokes' arrest, prosecution and conviction.

161.    Lee was coerced into making the false statement against Willie Stokes by Detectives Gilbert and Gerrard who offered him sex, drugs, and leniency in exchange for his lies against Mr. Stokes.

162.    Defendants DiDonato and Marano then relied upon the coerced testimony to secure a false conviction against Willie Stokes.

163.    By prosecuting Lee for perjury for the false statement that inculpated Willie Stokes in the crime, Defendants DiDonato and Marano acknowledge — and affirmed under oath — the falsity of his statement against Mr. Stokes.

164.    The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in the arrest and prosecution of Willie Stokes without probable cause.

165.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Willie Stokes' clearly established constitutional rights.    No reasonable officer, prosecutor or person would have believed this conduct was lawful.

166.    Federal *habeas* relief was granted in Willie Stokes' favor on December 30, 2021 by the Honorable Timothy J. Savage.

167.    The acts and omissions by the individual Defendants, as described in the preceding paragraphs, were the direct and proximate cause of Willie Stokes' injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Willie Stokes.

**COUNT II: 42 U.S.C. §1983**
**Deprivation of Liberty without Due Process of Law**
**By Fabricating Evidence in an Investigative Capacity and Suppressing Evidence in an**
**Administrative Capacity,  in violation of the Fourth and Fourteenth Amendments**

168.    Plaintiff incorporates by reference all of the foregoing paragraphs.

169.    Defendants DiDonato and Marano, acting individually and in concert, deprived Willie Stokes of his clearly established constitutional rights to Due Process when they fabricated evidence in an investigative capacity, outside their duties as prosecutors, and assembled and then signed the charging document against Lee for perjury.

170.    Defendants DiDonato and Marano were homicide prosecutors, they did not handle perjury cases. Further, prosecutors in the DAO did not draft or sign criminal Complaints/charging documents as the affiant.  Rather, it was the duty of the law enforcement officer/agency responsible for the investigation of the crime, to draft and sign criminal Complaints for the Prosecutors to then use in the subsequent prosecution of a case.

171.    Here, Defendants DiDonato and Marano usurped the investigative function of a law enforcement officer, and conducted their own, albeit brief, investigation into Lee's perjury charge, drafted the charging document and then Defendant Marano signed the document as its affiant, all of which was outside the scope of their duties as prosecutors.

172.    Defendants DiDonato and Marano further violated Willie Stokes' constitutional rights by encouraging and permitting Philadelphia police officers, including Detective-Defendants, to fabricate statements from jailhouse informants, describing Mr. Stokes' purported confession to the homicide, and in doing so, Defendants DiDonato and Marano were functioning not as advocates, but as investigators and even served as their own witnesses in seeking to generate evidence in support of a prosecution.

173.    Further, Defendants DiDonato and Marano specifically instructed PPD personnel, including Detective-Defendants, to maintain exculpatory and impeachment evidence in their file, instead of transferring it to the DAO for filing, so to avoid <u>Brady</u> obligations related to disclosure of exculpatory information. In doing so, Defendants DiDonato and Marano were functioning not as advocates, but as administrators seeking to maintain records and files in specific locations.

174.    Defendants DiDonato and Marano also usurped the administrative function of the DAO staff when they refused to submit the paperwork containing information of Lee's perjury conviction to Willie Stokes' homicide file, and prevented this information from being disclosed and discovered by Willie Stokes and his attorney(s).

175.    Defendants DiDonato and Marano performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Willie Stokes' clearly established constitutional rights.  No reasonable prosecutor or person would have believed this conduct was lawful.

176.    Further, no reasonable prosecutor or person would have engaged in the conduct of investigating, drafting, and signing as the affiant, a criminal Complaint against a suspect for perjury, because it was outside the scope of the prosecutor's duties and normal functions.

177.    Similarly, no reasonable prosecutor or person would have engaged in the conduct of circumventing proper administrative channels so to withhold paperwork from a defendant's file, because it was outside the scope of the prosecutor's duties and normal functions.

178.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Willie Stokes' injuries.  Defendants knew, or should have known,

that their conduct would result in Mr. Stokes's wrongful arrest, prosecution, conviction and incarceration.

## COUNT III: 42 U.S.C. §1983
## Civil Rights Conspiracy

179.    The individual Defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert in order to deprive Willie Stokes of his clearly established Fourth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and right to a fair trial.

180.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.    Suggesting, coercing and/or fabricating inculpatory evidence in the form of witness statements;

    b.    Coercing and fabricating false witness statements;

    c.    Intentionally or with deliberate indifference failing to comply with their duty to disclose <u>Brady</u> and impeachment material during the pendency of the case;

    d.    Wrongfully prosecuting Willie Stokes while knowing that they lacked probable cause;

    e.    Knowingly relying upon coerced and false testimony to convict Willie Stokes of crimes that he did not commit;

    f.    Knowingly relying upon coerced and false inculpatory statements to secure a conviction and close out a case rather than investigate and disclose exculpatory evidence in the homicide of Leslie Campbell; and

    g.    Committing perjury during hearings and trials.

181.    Defendants' acts and omissions, as described above, were the direct and proximate cause of Willie Stokes' injuries. Defendants knew, or should have known, that their conduct would result in Mr. Stokes' wrongful arrest, prosecution, conviction, and incarceration.

## COUNT IV: 42 U.S.C. §1983
### *Monell* Liability - Failure to Train, Supervise, and Discipline

182.     Plaintiff incorporates by reference all of the foregoing paragraphs.

183.     Defendant City, by and through the PPD, committed obvious failure in training and supervision of individual Defendants which resulted in a gross violation of Willie Stokes' constitutional rights.

184.     Detective-Defendants were obviously engaged in a highly inappropriate and unconstitutional pattern and practice of allowing inmates to have sex with women on police property and to consume drugs on police property, in exchange for false testimony to be used to secure convictions.

185.     Detective-Defendants were obviously engaged in a highly inappropriate and unconstitutional pattern and practice of coercing witnesses, and specifically jailhouse informants, to adopt false inculpatory statements used to support arrests and prosecutions in homicide cases.

186.     In furtherance of these grossly unconstitutional actions, Detective-Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

  a.     Suggesting, coercing and/or fabricating inculpatory evidence in the form of witness statements;
  b.     Coercing and fabricating false witness statements;
  c.     Intentionally or with deliberate indifference failing to comply with their duty to disclose <u>Brady</u> and impeachment material during the pendency of the case;
  d.     Wrongfully prosecuting Willie Stokes while knowing that they lacked probable cause;
  e.     Inappropriately using incentives like sex and drugs to coerce false statements against Willie Stokes;
  f.     Inappropriately using incentives like leniency and reduction of criminal charges against the witness to coerce false statements against Willie Stokes; and
  g.     Committing perjury during hearings and trials.

187.    Defendant City consciously or deliberately failed to train, supervise or discipline for the above-described failures, which knowingly lead to repeated violations of criminal defendants' constitutional rights.

188.    Defendant City consciously or deliberately failed to investigate and discipline PPD officers for their coercive interrogation tactics in the face of wide-spread constitutional violations as described in this Complaint.

189.    The PPD knowingly operated an inadequate disciplinary system which failed to investigate and discipline officers who engaged in unconstitutional conduct in deliberate indifference to the constitutional violations of individuals including Willie Stokes.

190.    Defendants' acts and omissions, as described above, were the direct and proximate cause of Willie Stokes' injuries. Defendants knew, or should have known, that their conduct would result in Mr. Stokes' wrongful arrest, prosecution, conviction, and incarceration.

191.    Defendant City acted with deliberate indifference to Willie Stokes' constitution rights, as described above.

**COUNT V: 42 U.S.C. §1983**
**Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by**
**Fabricating Evidence in violation of the Fourth and Fourteenth Amendments**

192.    Plaintiff incorporates by reference all of the foregoing paragraphs.

193.    The individual Detective-Defendants, acting individually and in concert, deprived Willie Stokes of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including, without limitation, the false statement of Lee, which was obtained by coercion through promises of sex, drugs, and leniency in exchange for his lies against Willie Stokes.

194.    The individual Detective-Defendants deprived Willie Stokes of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including, without limitation, information regarding the true circumstances of Leslie Campbell's murder, including Lee's interrogations, his actual statements, prior to Defendants' coercion and fabrication of his false statements - that Lee had no information implicating Willie Stokes.

195.    Detective-Defendants also withheld material exculpatory and impeachment evidence from prosecutors and defense, including, without limitation, information regarding the circumstances of Lee's interrogations and the incentives promised — and actually delivered — including providing women for Lee to have sex with at the police administration building, in exchange for his false testimony against Willie Stokes.

196.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Willie

Stokes' clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

197.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Willie Stokes' injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Stokes' wrongful arrest, prosecution, conviction and incarceration.

## COUNT VI: 42 U.S.C. §1983
## Municipal Liability Claim

198.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

199.    Defendant City, by and through its final policymakers, had in force and effect during time of Willie Stokes' wrongful arrest and conviction, and for many years preceding and following this investigation, a policy, practice or custom of unconstitutional misconduct in homicide and other criminal investigations, including, in particular, the use of coercive techniques in interviews and interrogations to obtain confessions, the fabrication of inculpatory evidence, the fabrication of incriminating statements from witnesses, suspects and arrestees by coercion, suggestion, and feeding details about the crime, and the withholding of exculpatory evidence.

200.    Final policymakers for Defendant City had actual or constructive notice of these practices, policies and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions, withholding exculpatory evidence, fabricating inculpatory evidence, and, particularly, fabricating incriminating statements from witnesses, suspects and arrestees by coercion, suggestion and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

201.    Such unconstitutional municipal customs, practices and/or policies were the moving force behind Willie Stokes' false, coerced and fabricated confession, causing his arrest, prosecution, and thirty-seven (37) years of incarceration, as well as all the other injuries and damages set forth hereinabove.

## COUNT VII
## Malicious Prosecution Under Pennsylvania State Law

202.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

203.    The individual Defendants initiated or continued proceedings against Willie Stokes, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Willie Stokes' favor on December 30, 2021, after his conviction and sentence was vacated by the Honorable Timothy J. Savage.

204.    As a result of this malicious prosecution, Willie Stokes sustained the injuries and damages set forth above.

**WHEREFORE,** Plaintiff, Willie Stokes, prays for the following relief:

A.    That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.    That the Court award punitive damages to Plaintiff, and against all Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C.    For a trial by jury;

D.    For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983 claims; and

E.    For any and all other relief to which Plaintiff may be entitled.



*Joshua Van Naarden*

Joshua Van Naarden, Esquire
Julia Ronnebaum, Esquire
Pa. I.D. Nos. 86740/326785
2001 Market Street, Suite 3700
Philadelphia, PA  19103
TEL:   (215) 960-0000
FAX:   (215) 960-0384

Dated:  January 27, 2022

# EXHIBIT A

COMMONWEALTH OF PENNSYLVANIA
PHILADELPHIA COUNTY

___ ✓ FELONY P/H
___ MISDEMEANOR TL
___ DIVERSION CASE

CRIMINAL COMPLAINT
COMMONWEALTH OF PENNSYLVANIA
COMMONWEALTH OF PENNSYLVANIA VS. FRANKLIN LEE

M.C.#: 84-09-1170        D.C.#:   80-23-50687

I, the undersigned, do hereby state under oath or affirmation:

(1) My name is: ROBERT J. MARANO, Assistant District Attorney.

(2) I accuse FRANKLIN LEE, who lives at 1517 N. Hollywood St., Phila., Pa., with violating the penal laws of Pennsylvania.

(3) The day and date when the accused committed the offense was on or about: Monday, August 20, 1984.

(4) The offense was committed in the County of Philadelphia.

(5) The acts committed by the accused were:  on May 30, 1984, the defendant was sworn and testified before the Honorable Arthur Kaffrissen in courtroom 675 City Hall and testified that he was told by Willie Stokes that he (Willie Stokes) shot and killed Leslie Campbell.  On 8/20/84 the defendant was again sworn in front of Judge Malmed in courtroom 654, City Hall, Phila., Pa. and stated that he lied on 5/20/84 in courtroom 675, City Hall, in violation of Pa. Penal Laws, Section(s) and Title(s):  4902 Perjury F3, all of which is against the peace and dignity of the Commonwealth.

(6) I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the charges I have made.

(7) I swear to or affirm the within complaint upon my knowledge, information and belief, and sign it on ___8/29/84___ before Philadelphia Municipal Court Judge ___

_____
Signature of Affiant

On August 29, 1984,  the above named affiant swore or affirmed that the facts set forth in the complaint were true and correct to the best of his/her knowledge, information and belief, and signed it in my presence.  I believe the within affiant to be a responsible person and that there is probable cause for the issuance of process.

_____      SEAL
Issuing Authority

WAIVER:  On _____, 19___, I appeared before Judge _____,
who read the above complaint to me and explained its contents, and I hereby
waived preliminary hearing and consent to be bound over to Court.

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF PHILADELPHIA    ss.

In the Common Pleas Court of the County of Philadelp

CRIMINAL SECTION

THE DISTRICT ATTORNEY OF PHILADELPHIA COUNTY BY THIS INFORMATION CHARGES—

FIRST COUNT —THAT ON OR ABOUT             MAY 30 , 1984
IN PHILADELPHIA COUNTY,

FRANKLIN LEE

IN AN OFFICIAL PROCEEDING, UNDER OATH OR EQUIVALENT
AFFIRMATION, FELONIOUSLY DID MAKE A FALSE STATEMENT, OR SWEAR
OR AFFIRM THE TRUTH OF A STATEMENT PREVIOUSLY MADE, WHEN THE
STATEMENT WAS MATERIAL AND THE DEFENDANT DID NOT BELIEVE IT TO
BE TRUE.

OFFICIAL PROCEEDING. -- PRELIMINARY HEARING ON MAY 30, 1984

OATH OR EQUIVALENT AFFIRMATION -- OATH SWORN TO BEFORE JUDGE KAFRIS

FALSE STATEMENT --          DEFENDANT STATED WILLIE STOKES TOLD HIM HE
KILLED LESLIE CAMPBELL.

MATERIALITY. -- WILLIE STOKES WAS CONVICTED OF MURDER.

BELIEF OF DEFENDANT -- DEFENDANT KNEW WILLIE STOKES HAD NOT MADE
SUCH A STATEMENT.

18 PA. S. 4902

All of which is against the Act of Assembly and the peace and dignity of the Commonwealth of Pennsylvania.

DISTRICT ATTORNEY
EDWARD G. RENDELL

ASSISTANT DISTRICT ATTORNEY
JOSEPH M. DOUGHERTY

31A (Rev. 5-81)