IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIE STOKES** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 22-0338** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                                        JANUARY 23, 2023

# MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff Willie Stokes ("Stokes"), who was recently exonerated after serving thirty-seven years in prison, commenced this civil action against several defendants, including the Estate of Detective Lawrence Gerrard ("Detective Gerrard") and the City of Philadelphia (the "City") (collectively, "Defendants").[1] In his complaint, Stokes asserts various civil rights claims against, *inter alia*, Detective Gerrard and the City pursuant to 42 U.S.C. § 1983, as well as state law claims premised on these Defendants' role in Stokes' wrongful conviction. [ECF 1].

Before the Court is Defendants' partial motion to dismiss filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), seeking the dismissal of specific claims at Count III (civil rights conspiracy) and Count V (deprivation of liberty without due process and denial of a fair trial), and the *Monell* claims at Counts IV and VI. [ECF 17]. In his response, Stokes opposes most of the

---

[1] In addition to Detective Gerrard and the City, the named defendants include Nicole Brongo Kiwa Nicole Ford, as Executrix of the Estate of Detective Ernest Gilbert ("Detective Gilbert"); Assistant District Attorney John DiDonato, Esquire ("ADA DiDonato"); and Assistant District Attorney Robert Marano, Esquire ("ADA Marano").

By Memorandum Opinion and Order dated August 9, 2022, this Court granted, *in part*, and denied, *in part*, ADA DiDonato's motion to dismiss the claims against him. [ECF 24, 25]. By Memorandum Opinion and Order dated October 31, 2022, this Court granted, *in part*, and denied, *in part*, ADA Marano's motion to dismiss the claims against him. [ECF 27, 28].

arguments in the motion. [ECF 21].[2] The issues raised in the motion have been fully briefed and are ripe for disposition. For the reasons set forth herein, Defendants' motion is granted, *in part*, and denied, *in part*.

**BACKGROUND**

When ruling on a motion to dismiss, a court must accept all well-pleaded facts in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The facts relevant to the underlying motion to dismiss are summarized as follows:[3]

> Plaintiff Willie Stokes is a sixty-year-old former prisoner who was recently exonerated of the 1980 murder of Leslie Campbell. His conviction occurred in August 1984. Stokes was incarcerated for over thirty-seven years. Stokes' conviction resulted from the solicitation of false testimony from prisoner Franklin Lee ("Lee") by Detectives Gerrard and Gilbert, and from the use of that false testimony at trial by ADAs Marano and DiDonato.

> *Lee's False Testimony and Stokes' Prosecution*

> In 1984, Lee was arrested on homicide and rape charges. While being held on these charges, Lee was brought to the Police Administration Building to meet with Philadelphia Police Department ("PPD") Detectives Gerrard and Gilbert, who were investigating Campbell's cold case file. During their meeting, Detectives Gerrard and Gilbert told Lee that they were investigating unsolved homicide cases and would return the favor if Lee helped them out. Initially, Lee told Detectives Gerrard and Gilbert that he did not know anything about Stokes' involvement in Campbell's murder. Sometime later, the Detectives instructed Lee to fabricate a false statement that Lee had heard Stokes boasting about getting away with Campbell's murder. In exchange for the false testimony, Detectives Gerrard and Gilbert offered Lee leniency in his sentence. The Detectives also offered to bring women to Lee who would provide him with drugs and sex. If Lee refused to testify as instructed, Detectives Gerrard and Gilbert threatened to arrange for a harsher sentence. Lee agreed to the deal.

> True to their promise, the Detectives brought Lee's then-girlfriend to an empty police interrogation room to have sex with him. When she refused to return

---

[2]   This Court has also considered the reply of Detective Gerrard and the City. [ECF 23].

[3]   These facts are drawn from Stokes' complaint and the exhibits attached thereto, [ECF 1], as well as matters of public record from Stokes' *habeas* proceedings, *Stokes v. Lamas*, No. 20-cv-2192 (E.D. Pa.).

for another visit, the Detectives brought in another woman to have sex with Lee in an interrogation room.

Consistent with the arrangement, Lee, at Stokes' May 1984 preliminary hearing, testified that he had overheard Stokes boasting about the murder of Campbell. However, at Stokes' trial on August 20, 1984, Lee refused to repeat his accusation against Stokes and, instead, recanted his earlier testimony. Nonetheless, ADA DiDonato presented Lee's preliminary hearing testimony at trial and urged the jury to accept Lee's preliminary testimony as true. On August 21, 1984, the jury convicted Stokes of murder in the first degree. Stokes was later sentenced to life in prison, without parole.

On August 29, 1984, ADAs Marano and DiDonato drafted a criminal complaint against Lee averring that Lee had made a false statement under oath. Lee was subsequently charged with perjury for knowingly making a false statement at the preliminary hearing. On January 14, 1985, Lee pleaded guilty to the perjury charge and received the maximum sentence. Stokes remained unaware of Lee's perjury prosecution until 2015.

*Stokes' Habeas Proceedings and Exoneration*

In 2015, Stokes learned of Lee's 1985 perjury conviction and obtained copies of Lee's criminal complaint, charging document, and criminal docket report. On March 23, 2020, Stokes filed a petition for a writ of *habeas corpus*. Magistrate Judge Carol Sandra Moore Wells held a hearing on November 9, 2021, in which Lee testified that he had been coerced into making the false statement against Stokes.

On December 22, 2021, Magistrate Judge Moore Wells issued a Report and Recommendation, recommending that Stokes' *habeas* petition be granted, finding, *inter alia*, that the Commonwealth of Pennsylvania's failure to disclose exculpatory information regarding Lee's perjury charge and subsequent conviction violated Stokes' rights under *Brady v. Maryland*, 373 U.S. 83 (1963). On December 30, 2021, the Honorable Timothy J. Savage approved and adopted the Report and Recommendation. Stokes' conviction was vacated, and the prosecution's request for *nolle prosequi* on all charges was granted on January 27, 2022.

*"Sex for Lies" Scheme by PPD Detectives*

According to the complaint, Lee was just one of several jailhouse informants who were offered leniency, sex, and drugs by PPD detectives in exchange for false testimony. The false testimony secured by the detectives resulted in the wrongful convictions of at least twenty people. For example, Detectives Gerrard, Gilbert, and four other unnamed detectives promised one detainee, Emanuel Clait, a short sentence and sexual encounters with four women in exchange for providing false testimony against Williams Franklin and Major

Tillery. Franklin and Tillery were ultimately convicted of a 1976 murder and were sentenced to life imprisonment. Detectives Gerrard and Gilbert offered a similar deal to Charles Atwell, whose girlfriend visited him eight times to have sex with him in police interrogation rooms.

These practices by PPD detectives date back to the 1970s and continued beyond the 1984 investigation of Campbell's murder. These practices were also detailed in 1977–78 Pulitzer Prize-winning reporting by the *Philadelphia Inquirer* and became the subject of government investigations, complaints by lawyers and civilians, litigation, and internal police investigations, including the 39th District Corruption Scandal.

According to the complaint, the 39th District Corruption Scandal involved misconduct very similar to that involving Lee and Stokes. Specifically, the scandal exposed that PPD officers in the Homicide Unit routinely withheld exculpatory evidence, used physical abuse and coercive interrogation tactics, and produced false allegations. Investigations into the corruption in the 39th District led to a consent decree issued in the federal matter of *NAACP v. City of Philadelphia*, as well as widespread reforms and limitations on certain investigative practices and policies. At least three other federal lawsuits during the 1980s led to similar orders enjoining the PPD from engaging in unlawful practices. In addition to the consent decree, three other federal lawsuits resulted in court orders enjoining the PPD from engaging in the above-detailed practices.

In one state-court criminal appeal, *Commonwealth v. Lester*, 572 A.2d 694, 695 (1990), the Superior Court of Pennsylvania found that the appellant therein had shown that Detectives Gerrard and Gilbert—incidentally, the same detectives involved in the instant matter—facilitated sexual rendezvous with his wife and other women to induce his cooperation and confession. The court reversed and remanded the matter for a new trial. The events at issue in *Lester* occurred around late 1983 or early 1984—the same time of Stokes' prosecution.

According to the complaint, the PPD's Internal Affairs Division's disciplinary mechanisms did not impose meaningful discipline and/or remedies for the conduct detailed above.

**LEGAL STANDARD**

Rule 12(b)(6) governs motions to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). The court must determine "whether the facts alleged in the

4

complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). The complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id.* (internal quotation marks and citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)) (alterations in original). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege facts sufficient to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

**DISCUSSION**

In the complaint, Stokes asserts claims against Detective Gerrard for malicious prosecution in violation of the Fourth Amendment to the United States Constitution (Count I), civil rights conspiracy (Count III), deprivation of liberty without due process of law and denial of a fair trial by fabricating evidence in violation of the Fourth and Fourteenth Amendments (Count V), and malicious prosecution in violation of Pennsylvania state law (Count VII). Stokes also asserts two *Monell* claims for municipal liability against the City (Counts IV and VI).[4]

---

[4] Count II contains claims against ADA DiDonato and ADA Marano for deprivation of liberty without due process of law and denial of a fair trial by fabricating and suppressing evidence in violation of the Fourth and Fourteenth Amendments.

In the underlying partial motion to dismiss, Defendants essentially argue that some portions of Stokes' claims against Detective Gerrard at Counts III and V should be dismissed on the basis of his entitlement to qualified immunity and/or as time-barred.[5] Defendants also argue that the claims against the City at Counts IV and VI should be dismissed for failure to state plausible *Monell* claims. The arguments with respect to each claim will each be addressed in turn.

### ***Stokes' Claim for Deprivation of Liberty Without Due Process of Law Against Detective Gerrard (Count V)***

At Count V of the complaint, Stokes asserts a 42 U.S.C. § 1983[6] claim for deprivation of liberty without due process of law premised, *in part*, on Detective Gerrard's alleged role in withholding exculpatory evidence in violation of *Brady*.[7] In the motion to dismiss, Detective Gerrard argues that he is entitled to qualified immunity with respect to this conduct because Stokes does not allege that Detective Gerrard violated a then "clearly established" constitutional right.

*Qualified immunity* shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to a qualifiedly immunity defense, a court must determine

---

[5] Defendants do not move to dismiss Counts III and V in their entirety, nor do they move to dismiss any portions of Counts I or VII.

[6] Section 1983 provides an avenue for private citizens to seek civil remedies when they have been deprived of their rights by a state official in violation of federal law. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but rather serves as a mechanism for vindicating rights otherwise protected by federal law. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). For a viable § 1983 claim, a plaintiff must allege facts to plausibly show "a violation of a right secured by the Constitution and laws of the United States and that the alleged deprivation was committed by a person acting under color of state law." *See Kneipp*, 95 F.3d at 1204 (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)) (alteration omitted).

[7] In the landmark decision in *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

(1) whether the officer violated a constitutional right and, if so, (2) whether the right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). These questions can be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The court must view the facts "in the light most favorable to the party asserting the injury." *Scott v. Harris*, 550 U.S. 372, 377 (2007). Officers seeking qualified immunity bear the burden of establishing their entitlement to this affirmative defense. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014) (citing *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010)).

The term "clearly established" means that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, — U.S. —, 138 S. Ct. 577, 589 (2018) (internal quotations and citation omitted). For qualified immunity purposes, "clearly established rights are derived either from binding Supreme Court and [the United States Court of Appeals for the] Third Circuit [(the "Third Circuit")] precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals." *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (internal quotations and citation omitted). In determining whether the alleged right was clearly established at the relevant time, there does not need to be "a case on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). That is, the court must "conclude that the firmly settled state of the law, established by a forceful body of persuasive precedent, would place a reasonable official on notice that his actions obviously violated a clearly established constitutional right." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 639 (3d Cir. 2015) (citations omitted). However, the court must keep in mind the Supreme Court's repeated directives "not to define clearly established law at a

high level of generality" but, instead, conduct this analysis "in light of the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted).

Here, Detective Gerrard argues that he is entitled to qualified immunity for his alleged failure to disclose *Brady* material because the attachment of *Brady* obligations **to police officers** was not clearly established in 1984, when the conduct underlying Stokes' conviction occurred. Stokes concedes that Detective Gerrard is entitled to qualified immunity on these claims to the extent they are premised on Detective Gerrard's failure to disclose *Brady* material to Stokes and his attorneys. Based on the caselaw cited, this Court agrees. Though under current precedent, police officers "may be liable under § 1983 for failure to disclose exculpatory information to the prosecutor . . . ," *Lewis v. City of Phila.*, 2020 WL 1683451, at *9 (E.D. Pa. Apr. 6, 2020) (citing *Gibson v. Superintendent of N.J. Dep't of L. & Pub. Safety*, 411 F.3d 427, 443 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181 (3d Cir. 2010)), this constitutional obligation on the part of law enforcement officers "was not recognized" by the Third Circuit until *Gibson* in 2005, *id.* Because the right to disclosure of *Brady* material by law enforcement officers was not clearly established in 1984, Detective Gerrard is entitled to qualified immunity for his failure to disclose exculpatory information to Stokes.

Nonetheless, Stokes argues that his claims against Detective Gerrard "are not solely premised upon a failure to disclose exculpatory evidence to Mr. Stokes and his attorneys but are also premised upon a failure to disclose exculpatory evidence to the prosecutors." (Stokes' Resp. in Opp., ECF 21, at p. 11). This argument is, however, unavailing. *Gibson*, the governing Third Circuit authority that recognized that *Brady* obligates police officers to turn over exculpatory evidence, involved a situation wherein the officer-defendants failed to disclose such information *to prosecutors*. 411 F.3d at 442–43. The *Gibson* court expressly concluded that the officers were

entitled to qualified immunity because their obligation "to disclose information ***to the prosecutor*** was not widely addressed" by the Third Circuit or the Supreme Court until at least 2000. *See id.* Therefore, to the extent Stokes' due process claim against Detective Gerrard is also premised on Detective Gerrard's alleged failure to turn over exculpatory information to the prosecutors, this claim fails. Detective Gerrard is entitled to qualified immunity. Accordingly, Defendants' motion to dismiss the portions of Count V premised on a failure to disclose exculpatory information is granted, and said portions of Count V are dismissed.

### *Stokes' Claim for Civil Rights Conspiracy Against Detective Gerrard (Count III)*

At Count III of the complaint, Stokes avers that Detective Gerrard conspired to violate his civil rights under § 1983. Stokes premises these averments on, *inter alia*, Detective Gerrard's alleged role in the conspiracy to deprive Stokes of his rights, under the Fourth and Fourteenth Amendments, to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law. Detective Gerrard moves to dismiss this claim and proffers several arguments, each of which this Court will addressed separately.

1. *Withholding Exculpatory Evidence*

Detective Gerrard moves to dismiss this conspiracy claim premised on Stokes' allegations that he withheld exculpatory information in violation of *Brady*. In the above discussion of Count V, this Court concluded that Detective Gerrard is entitled to qualified immunity with respect to Stokes' claims that he (Detective Gerrard) withheld exculpatory information in violation of *Brady*, as this was not a clearly established right in 1984. For the same reasons, Detective Gerrard is entitled to qualified immunity with respect to Stokes' conspiracy claim premised on these same allegations. *See Ippolito v. Aherne*, 2015 WL 6447153, at *6 (E.D. Pa. Oct. 26, 2015) (stating that

9

an official who is immune from suit for a § 1983 violation is also immune from liability for a conspiracy claim based on the same underlying conduct). Therefore, the conspiracy claim premised on Detective Gerrard's alleged *Brady* violation is dismissed.

2. *Malicious Prosecution*

Detective Gerrard also argues, and Stokes concedes, that Stokes' malicious prosecution conspiracy claim at Count III should be dismissed on qualified immunity grounds, because a malicious prosecution claim grounded in the Fourteenth Amendment is not clearly established under current Third Circuit precedent. This Court agrees. *See Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 382 (E.D. Pa. 2018) (granting qualified immunity to officials on Fourteenth Amendment malicious prosecution claim and noting "[t]he Supreme Court has not yet articulated such a right"); *see also Lewis*, 2020 WL 1683451, at *6–7 (granting qualified immunity on Fourteenth Amendment malicious prosecution claim amid "scattered legal landscape," while rejecting argument that claim was barred as a matter of law). In light of the caselaw and concession, Defendants' motion to dismiss Stokes' malicious prosecution conspiracy claim at Count III, to the extent it is grounded in the Fourteenth Amendment, is granted, and said claim is dismissed.[8]

3. *Unreasonable Searches and Seizures, False Arrest, and False Imprisonment*

As to Stokes' claims of conspiracy to deprive him of his rights to be free from unreasonable searches and seizures, false arrest, and false imprisonment, Detective Gerrard argues that these specific claims are barred by the applicable statute of limitations. In his response, Stokes appears

---

[8] As noted by Stokes in his response to Defendants' motion to dismiss, Count III of Stokes' complaint includes references to both the Fourteenth and Fourth Amendments. To the extent Stokes' malicious prosecution conspiracy claim is grounded in the Fourth Amendment, such claim is unchallenged by Defendants and, therefore, survives the motion to dismiss. *See Thomas*, 290 F. Supp. 3d at 379–83 (separately analyzing malicious prosecution claims under the Fourth and Fourteenth Amendments, denying a motion to dismiss as to the former while granting as to the latter).

to concede that these claims are time-barred under the Fourth Amendment. (*See* Stokes' Resp. in Opp., ECF 21, at pp. 6, 12). However, Stokes contends that his false imprisonment conspiracy claim grounded in the Fourteenth, rather than Fourth, Amendment is not time-barred. Stokes is, however, mistaken.

It is well-settled that the statute of limitations period for a § 1983 civil rights action is the limitations period for personal injury torts in the state where the cause of action arose. *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). Undeniably, the events giving rise to Stokes' cause of action all occurred in Pennsylvania. Thus, Pennsylvania's two-year statute of limitations governing personal injury claims applies here to Stokes' civil rights claims.[9] *See* 42 Pa. Cons. Stat. § 5524(1); *Kach*, 589 F.3d at 634; *Garvin v. City of Phila.*, 354 F.3d 215, 220 (3d Cir. 2003).[10]

While state law dictates the limitations period for a § 1983 claim, federal law governs the determination as to when such a claim accrues. *See Wallace*, 549 U.S. at 388. Generally, under federal law, a cause of action accrues and the statute of limitations begins to run as soon as the plaintiff is aware—or should be aware—of the existence of and/or the source of an injury. *Sameric Corp. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998); *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir. 1982). The limitations period for civil rights conspiracy claims under § 1983, such as Stokes' claims, "runs from each overt act causing damage." *Little v. City & Cnty. of Phila.*, 2008

---

[9] All parties appear to agree that Pennsylvania's statute of limitations applies to Stokes' claims as they cite to Pennsylvania law in their respective briefs.

[10] While the statute of limitations is generally an affirmative defense that a defendant must plead in an answer, a court may grant a motion to dismiss on statute of limitations grounds "when the statute of limitations defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). Because the statute of limitations argument is an affirmative defense, the burden of establishing its applicability rests upon the movant—here, Detective Gerrard. *See* Fed. R. Civ. P. 8(c)(1); *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989).

WL 2704579, at *3 (E.D. Pa. July 3, 2008) (quoting *Wells v. Rockefeller*, 728 F.2d 209, 217 (3d Cir. 1984)).

Stokes' allegations regarding Detective Gerrard's overt acts leading to the alleged false arrest and imprisonment refer to conduct that occurred in 1984. These events were known to Stokes. Thus, the two-year limitations period for Stokes' § 1983 false arrest and imprisonment conspiracy claims ended two years later, in 1986. *See Wells*, 728 F.2d at 217 (stating that civil conspiracy claims accrue from the time of each overt act). Because Stokes did not bring these claims until 2022, when he was finally released from custody, the claims are deemed time-barred.[11]

Nonetheless, Stokes contends that his false imprisonment conspiracy claim grounded in the Due Process Clause of the Fourteenth Amendment—rather than the Fourth—is not time-barred. Stokes argues that this cause of action accrued on January 27, 2022, when his conviction was vacated, because Fourteenth Amendment due process claims do not accrue at the same time as Fourth Amendment claims. This argument is misplaced. Although Stokes remained incarcerated from the time of his purported false arrest until his conviction was vacated, his Fourth Amendment claim never turned into a due process claim. *See Manuel v. City of Joliet*, 580 U.S. 357, 137 S. Ct. 911, 918–19 (2017) (explaining that the fact that "[l]egal process has gone forward . . . cannot extinguish the detainee's Fourth Amendment claim—or somehow . . . convert that claim into one founded on the Due Process Clause"). In other words, Stokes' false imprisonment conspiracy claims premised on either the Fourth or Fourteenth Amendment theories are one and the same. As this Court has concluded, the clock began running on Stokes' false

---

[11] As noted, Stokes appears to concede that his conspiracy claims for unreasonable search and seizure, false arrest, and false imprisonment under the Fourth Amendment are time-barred. In a footnote, Stokes indicates that he "disagrees that his claims are totally time-barred under the statute of limitations," but he provides no substantive legal argument to support this statement apart from his contention that his Fourteenth Amendment conspiracy claims are not barred by the statute of limitations. (*See* Stokes' Resp. in Opp., ECF 21, at pp. 6, 12).

imprisonment conspiracy claim—whether grounded in the Fourth or Fourteenth Amendment—in 1984. Because Stokes did not bring this claim until 2022, the claim is time-barred.

Stokes further argues that his false imprisonment conspiracy claim under the Fourteenth Amendment is analogous to one for malicious prosecution—a claim that accrued when his conviction was vacated in 2022. However, as explained above, it is not clearly established that the Fourteenth Amendment protects a right against malicious prosecution. *See Thomas*, 290 F. Supp. 3d at 382. Officers are entitled to qualified immunity from liability unless the alleged conduct violated "clearly established statutory or constitutional rights." *See Harlow*, 457 U.S. at 818. Thus, even assuming that Stokes' false imprisonment conspiracy claim is analogous to a Fourteenth Amendment malicious prosecution conspiracy claim, Detective Gerrard would be entitled to qualified immunity for any such claim.

For the reasons set forth, the motion to dismiss the conspiracy claims at Count III based on theories of unreasonable searches and seizures, false arrest, and false imprisonment is granted. Accordingly, these claims are dismissed.

### ***Stokes' Claim Against the City for Failure to Train, Supervise, and Discipline (Count IV)***

At Count IV of the complaint, Stokes asserts a civil rights or *Monell* claim against the City for failure to train, supervise, and discipline police officers. In its motion, Defendant City argues that (1) Count IV should be dismissed because Stokes has not alleged any action or inaction by the City showing deliberate indifference and (2) even if Stokes' allegations are sufficient, the portions of the claim based on alleged *Brady* violations should be dismissed because Stokes had no clearly established right at the time.

To state a viable claim for municipal liability under § 1983, a plaintiff must plead facts sufficient to plausibly show (1) a constitutional violation by a municipal actor (2) that was caused

by a municipal policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).

To plead a failure-to-train claim, a plaintiff must ordinarily allege a "'pattern of similar constitutional violations by untrained employees' [] 'to demonstrate deliberate indifference.'" *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Deliberate indifference occurs if (1) "municipal supervisors had contemporaneous knowledge of the offending incident or of a 'prior pattern of similar incidents,'" and (2) "the supervisors' action or inaction somehow communicated approval of the offending behavior." *Tobin v. Badamo*, 78 F. App'x 217, 219 (3d Cir. 2003) (quoting *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998)); *see also Langweiler v. Borough of Newtown*, 2010 WL 5393529, at *7 (E.D. Pa. Dec. 29, 2010) (citing *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2002) (*en banc*)).

Similarly, to plead a viable failure-to-supervise or failure-to-discipline claim, a plaintiff must plead facts to show a failure to supervise or discipline that "reflects a policy of deliberate indifference to constitutional rights." *Wiggs v. City of Phila.*, 2014 WL 772538, at *4 (E.D. Pa. Feb. 27, 2014) (citing *Montgomery*, 159 F.3d at 126–27); *see also Kirksey v. Ross*, 372 F. Supp. 3d 256, 263 (E.D. Pa. 2019) (recognizing failure-to-discipline theory of *Monell* liability); *McDaniels v. City of Phila.*, 234 F. Supp. 3d 637, 644 (E.D. Pa. 2017) (same). For a failure-to-discipline claim, the plaintiff "must identify a failure to provide specific [discipline] that has a causal nexus with their injuries and must demonstrate that the absence of that specific [discipline] can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional

14

deprivations occurred." *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).  Where the risk to constitutional rights is not obvious from the nature of the activity, "deliberate indifference on the part of the city policymakers to the need for" discipline may be inferred from "a pattern of constitutional violations." *Sample v. Diecks*, 885 F.2d 1099, 1116 (3d Cir. 1989).

The plaintiff must show "both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate."  *Montgomery*, 159 F.3d at 127.  "Constructive knowledge or a showing that a policymaker 'should have known' about the pattern of constitutional misconduct is sufficient." *Jackson v. Corizon Health, Inc.*, 2019 WL 4222599, at *3 (E.D. Pa. Sept. 5, 2019) (quoting *Forrest v. Parry*, 930 F.3d 93, 109 (3d Cir. 2019)).

Here, the City argues that Stokes has failed to allege that the municipality was deliberately indifferent to Stokes' rights.  The City's argument is unpersuasive.  Stokes' complaint contains pages of detailed allegations regarding PPD officers' use of coercive practices to obtain false statements and the withholding of exculpatory evidence, resulting in the wrongful convictions of at least twenty people.  Specifically, in the complaint, Stokes alleges that Detectives Gerrard and Gilbert, along with at least four other detectives, allegedly engaged in "sex for lies" deals with multiple detained informants, including Lee.  Stokes also alleges that the PPD—specifically, its Internal Affairs Division—failed to maintain disciplinary mechanisms to remedy these violations and/or implement adequate training or supervision to prevent them.  Taken together, these allegations, accepted as true—as this Court must at this stage of the proceedings—demonstrate a "pattern" of constitutional violations and circumstances under which the PPD supervisors' inaction could be found to have communicated approval.  *See Montgomery*, 159 F.3d at 127.

Stokes also alleges that there were contemporaneous newspaper articles, government investigations, and lawsuits as a result of these practices beginning around 1977 or 78, years before the underlying facts in this case. These allegations—coupled with the allegations of widespread coercion and fabrication of evidence by PPD detectives—plausibly show that City policymakers were, at the very least, on constructive notice that PPD officers were repeatedly engaging in unlawful conduct. *See Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 913 (3d Cir. 2003) ("[C]onstructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them.") (citations omitted). Taking these extensive allegations as true, as is required at this stage of the proceedings, this Court finds that Stokes' complaint plausibly states a *Monell* claim against the City for failure to train, supervise, and/or discipline. As such, the motion to dismiss this claim on this basis is denied.

The City further argues that this *Monell* claim should be dismissed to the extent it is based on the alleged withholding of exculpatory information, as Stokes' right against this constitutional violation was not clearly established at the time of the alleged conduct. This Court agrees. While the Third Circuit has not yet addressed the issue, "[s]everal courts of appeals have held that if a right is not clearly established, a municipal entity cannot be deliberately indifferent to it." *Lewis*, 2020 WL 1683451, at *12 (citing *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017); *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007); *Young v. Cnty. of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998)). This Court finds these decisions persuasive, as have other courts in this district that have dismissed *Monell* claims where the constitutional right was not clearly established at the time of the alleged conduct. *See, e.g.*, *Thomas*, 290 F. Supp. 3d at 387 (dismissing *Monell* claims

16

based on theories of malicious prosecution, *Brady* violations, and failure to investigate as the underlying rights were not clearly established in 1994); *Lewis*, 2020 WL 1683451, at *12 (dismissing similar claims based on conduct occurring in 1997); *Ogrod v. City of Phila.*, 2022 WL 1093128, at *15 (E.D. Pa. Apr. 12, 2022) (dismissing municipal liability claim based on *Brady* violations occurring in 1996).

As discussed above, the right against the withholding of exculpatory *Brady* information by police officers was not a clearly established right in 1984. *See Lewis*, 2020 WL 1683451, at *9 (citing *Gibson*, 411 F.3d at 443). Because this specific right was not clearly established at the time of the alleged conduct in this case, it is this Court's opinion that it cannot form the basis of a claim for municipal liability. Therefore, Stokes' *Monell* claim at Count IV is dismissed to the extent it is premised on the City's involvement in the officers' failure to disclose exculpatory information.

### *Stokes' Claim Against the City for Municipal Liability (Count VI)*

Count VI of the complaint contains a § 1983 claim against the City premised on its alleged unlawful policies or customs. Defendant City argues that the claim should be dismissed because Stokes has not cited to an official policy, nor has he identified a municipal policymaker. The City is mistaken.

To assert a plausible *Monell* claim based on a municipal policy or custom, the plaintiff must allege facts showing that municipal policymakers established or maintained a policy or custom that caused a municipal employee to violate a plaintiff's constitutional rights. *Monell*, 436 U.S. at 694. The policy must be the "moving force" behind the constitutional tort. *Id.* Thus, the plaintiff must allege facts showing an "affirmative link" or "plausible nexus" between the custom or practice and the alleged constitutional violation. *Bielevicz v. Dubinon*, 915 F.2d 845, 850–51

17

(3d Cir. 1990). The policy or custom must also exhibit deliberate indifference to the constitutional rights of those it affects. *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996).

"Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (internal citations and quotations omitted). "Customs are 'practices of state officials . . . so permanent and well settled as to virtually constitute law.'" *Id.* (quoting *Monell*, 436 U.S. at 691). "[C]ustom requires proof of knowledge and acquiescence by the decisionmaker." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009). In other words, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz*, 915 F.2d at 850 (citation omitted). Widespread behavior by police officers does not amount to a municipal custom unless there is "knowledge and acquiescence by the decisionmaker." *McTernan*, 564 F.3d at 658 (citation omitted).

Here, the City argues that Stokes' allegations are insufficient to support a *Monell* claim based on a municipal policy or custom because he does not cite to an official policy of the City. However, in the complaint, Stokes has plausibly alleged that the City maintained unlawful municipal customs, and included detailed allegations of PPD detectives fabricating false statements using coercive practices, resulting in the wrongful convictions of numerous people over multiple decades. Taking these allegations as true, this Court finds this pattern of unchecked behavior by City employees constitutes a practice "so permanent and well settled as to virtually constitute law." *Berg*, 219 F.3d at 275 (quoting *Monell*, 436 U.S. at 691). Furthermore, Stokes alleges that the City was aware of this unlawful custom through newspaper articles, government investigations, and lawsuits as of 1977. Therefore, at this stage of the proceedings, these

allegations are sufficient to show that municipal policymakers had at least constructive knowledge of the alleged unlawful customs and failed to act. *See Hernandez*, 58 F. App'x at 913.

The City also argues that Stokes' *Monell* claim should be dismissed for failure to identify a municipal policymaker responsible for his alleged injuries. This argument is also misplaced. While a viable *Monell* claim based on an unlawful policy or custom must plausibly allege that an official with policymaking power is responsible for or acquiesced to the policy or custom, the notion that the plaintiff must "specifically identify" the responsible decisionmaker has been rejected by the Third Circuit. *See Bielevicz*, 915 F.2d at 850 ("Practices 'so permanent and well settled as to have the force of law [are] ascribable to municipal decisionmakers.'") (quoting *Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986)) (other citation and internal quotation marks omitted). Indeed, courts in this district have concluded that a "wooden requirement" that the plaintiff identify a municipal policymaker by name would be "out of step with the notion that an indirect inference of policymaker awareness suffices at the pleading stage." *See, e.g.*, *Jackson v. Corizon Health, Inc.*, 2018 WL 3438756, at *5 (E.D. Pa. July 17, 2018). As discussed, Stokes has alleged an extensive pattern of constitutional violations by City employees and, at least, constructive knowledge of these violations by the City. This knowledge is ascribable to City policymakers due to its widespread, well settled nature. *See Bielevicz*, 915 F.2d at 850.

For the reasons set forth, this Court finds that Stokes' complaint plausibly states a *Monell* claim against the City based on a municipal policy or custom. As such, the motion to dismiss this claim on the basis that Stokes has failed to cite a municipal policy or identify a specific municipal policymaker is denied.

Lastly, the City also argues that Stokes' claim should be dismissed to the extent it is premised on the alleged withholding of exculpatory information, as Stokes' right against this

constitutional violation was not clearly established at the time of the alleged conduct. This Court addressed a similar argument with respect to Stokes' *Monell* claim for failure to train, supervise, or discipline. For the same reasons indicated there, Stokes' *Monell* claim here based on a municipal policy or custom is dismissed to the extent it is premised on the City's involvement in officers' failure to disclose exculpatory information.

**CONCLUSION**

Based on the analysis and reasons set forth, Defendants' motion to dismiss is granted, *in part*, and denied, *in part*. In summary, this Court finds as follows:

(1) Stokes' § 1983 claims against Detective Gerrard for civil rights conspiracy (Count III) and denial of liberty without due process of law (Count V) premised on Detective Gerrard's alleged failure to disclose exculpatory information in violation of *Brady* are dismissed because Detective Gerrard is entitled to qualified immunity, and Defendants' motion is *granted*;

(2) Stokes' § 1983 malicious prosecution conspiracy claim (Count III), to the extent that claim is grounded in the Due Process Clause of the Fourteenth Amendment *only*, is dismissed because Detective Gerrard is entitled to a qualified immunity defense, and Defendants' motion is *granted*, *in part*;

(3) Stokes' § 1983 conspiracy claims against Detective Gerrard (Count III) based on theories of unreasonable searches and seizures, false arrest, and false imprisonment are dismissed as barred by the applicable statute of limitations, and Defendants' motion is *granted*;

(4) Stokes' *Monell* claims against the City (Count IV and VI) are dismissed *only* to the extent these claims are premised on the City's involvement in officers' failure to disclose exculpatory information in violation of *Brady*, and Defendants' motion is *granted*, *in part*; and

(5) Defendants' motion is denied in all other respects.

An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.